# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Val Jean Keller, Trustee, for the heirs
and next of kin of Roger Keller,

        Plaintiff,

v.

CNH America, LLC,

        Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 07-1648 ADM/AJB

---

Kristi A. Hastings, Esq., Reed T. Mahlke, Esq., and Stephen F. Rufer, Esq., Pemberton, Sorlie, Rufer & Kershner, PLLP, Fergus Falls, MN, on behalf of Plaintiff.

Daniel A. Haws, Esq., and Kelly S. Hadac, Esq., Murnane Brandt, PA, St. Paul, MN, on behalf of Defendant.

---

## I. INTRODUCTION

On March 24, 2009, the undersigned United States District Judge heard oral argument on Defendant CNH America, LLC's ("CNH") Motion for Summary Judgment [Docket No. 53]. In her Amended Complaint [Docket No. 47], Plaintiff Val Jean Keller ("Plaintiff") asserts claims of negligence, strict products liability, breach of express and implied warranties, and failure to provide post-sale warnings. For the reasons stated herein, Defendant's Motion is granted in part and denied in part.

## II. BACKGROUND[1]

On September 30, 2005, Roger Keller ("Keller"), a life-long farmer, was operating his Case International Model 1660 combine ("the Combine") equipped with a Model 1020 grain

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

header ("the Header") in his soy bean field near Ashby, Minnesota. Haws Aff., Jan. 30, 2009 [Docket No. 56], Ex. 3 (Val Keller Dep.) 14:21-15:7; Am. Compl. ¶ IV. Keller purchased the Combine, which was manufactured in 1989 by CNH, new from a dealer in June 1991; he purchased the Header in 1998. Haws Aff., Jan. 30, 2009, Ex. 5 (Watt Dep.) 32:9-12; Ex. 1 (Kock Report) at 2; Haws Aff., Jan. 30, 2009, Ex. 6. The Combine and the Header include a function known as the automatic header height control system ("AHHCS"), which, when engaged, senses the contours of the ground and automatically raises or lowers the Header to maintain a height selected by the operator. Haws Aff., Jan. 30, 2009, Ex. 8 at 55, 81.

Although there were no eyewitnesses to the accident on September 30, 2005, experts opine that the Header unexpectedly rose to its upper-most position and remained there even though Keller had not commanded the Header to do so. Kock Report at 3; Fluent Aff. ¶ 1, Aug. 28, 2008 [Docket No. 43], Ex. A (Fluent Report I) at 3. Keller crawled under the Header with tools to attempt to fix whatever had caused the Header to rise unexpectedly, and while doing so, he moved something that allowed a "pivot pipe to rotate." Fluent Report I at 3. This in turn caused a signal to be sent to the AHHCS, directing the Header to lower to the ground, which killed Keller. Fluent Report I at 3; Am. Compl. ¶ 2.

After the accident, a service technician examined and attempted to repair the Combine and the Header. Kock Report at 2. When the service technician started the Combine and engaged the AHHCS, the Header rose to its maximum height instead of to the height selected on the controls in the operator cab. Id. Also, the mechanical pointer on the AHHCS indicated a full down position despite the Header actually being in the full up position. Id. Upon closer inspection, the service technician determined that a pipe in the AHHCS was bent, preventing it

2

from being able to rotate as it was supposed to.  Id.

In March 2007, Plaintiff filed this lawsuit, asserting claims of negligence, strict products liability, design defect, and failure to warn.  Plaintiff alleges that the Combine and the Header were defectively designed, rendering them unreasonably dangerous.  Specifically, Plaintiff claims that CNH should have applied other technologies that were available when the Combine and the Header were manufactured that would disengage the AHHCS either when the Header was raised to the full up position or when the operator left the Combine's cab.

### III. DISCUSSION

**A.     Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     Primary Assumption of Risk**

CNH argues that the evidence of record conclusively demonstrates that Keller knew and appreciated the risk he was taking when he crawled under the Header but voluntarily chose to

3

accept that risk. Therefore, CNH concludes, summary judgment is appropriate because Keller primarily assumed the risk.

Minnesota law recognizes two types of assumption of the risk, primary assumption of the risk and secondary assumption of the risk. See Andren v. White-Rodgers Co., a Div. of Emerson Elec. Co., 465 N.W.2d 102, 104 (Minn. Ct. App. 1991). Primary assumption of the risk,[2] which acts as a complete bar to a plaintiff's recovery, Armstrong v. Mailand, 284 N.W.2d 343, 348 (Minn. 1979), is "applicable only where parties have voluntarily entered a relationship in which plaintiff assumes well-known, incidental risks. As to those risks, the defendant has no duty to protect the plaintiff and, thus, if the plaintiff's injury arises from an incidental risk, the defendant is not negligent," Olson v. Hansen, 216 N.W.2d 124, 127 (Minn. 1974). Secondary assumption of the risk, on the other hand, "is a type of contributory negligence where the plaintiff voluntarily encounters a known and appreciated hazard created by the defendant without relieving the defendant of his duty of care with respect to such hazard."[3] Armstrong, 284 N.W.2d 349. The elements of both primary and secondary assumption of the risk are the same: (1) the plaintiff had knowledge of the risk, (2) the plaintiff appreciated the risk, and (3) the plaintiff had a choice to avoid the risk but voluntarily chose to accept it. Andren, 465 N.W.2d at 104-05.

---

[2] Minnesota courts have applied primary assumption of the risk to claims of products liability, negligence, failure to warn, and breach of warranty. Andren, 465 N.W.2d at 105 (products liability); Kudja v. Becker, No. A04-1093, 2004 WL 2795202, at *1 (Minn. Ct. App. Dec. 7, 2004) (failure to warn); Armstrong, 284 N.W.2d at 350, 352, n.2 (negligence and products liability based on breach of warranty) (citing Pritchard v. Liggett & Meyers Tobacco Co., 350 F.2d 479, 485 (3d Cir. 1965)).

[3] Secondary assumption of the risk bars a plaintiff's recovery only to the extent that the jury finds comparative fault in the plaintiff's assumption of the risk. Walk v. Starkey Machinery, Inc., 180 F.3d 937, 940 (8th Cir. 1999) (Lay, J., dissenting) (citing T.H.S. Northstar Assocs. v. W.R. Grace & Co., 66 F.3d 173, 176 (8th Cir. 1995)).

4

Whether primary rather than secondary assumption of the risk should apply in a particular case turns on whether there has been any "manifestations of acceptance and consent." Id. at 105. "The essential element of primary assumption of risk is that the plaintiff consciously and voluntarily agreed that the defendant would not have a duty to protect against a particular danger inherent in their dealing." T.H.S., 66 F.3d at 176. "The defendant pleading primary assumption of the risk must demonstrate that by proceeding with the activity, the plaintiff intended to relieve the defendant of any duty to protect against a risk that was inherent, obvious, and unavoidable." Id. The record here fails to demonstrate, as a matter of law, that Keller expressly or impliedly manifested consent to relieve CNH of any duty to protect against an obvious and unavoidable risk.[4] Although the risk of crawling underneath the header without engaging the safety lock or taking other precautionary measures presents, on a general level, a "relatively self-evident" risk, "'[n]ot every deliberate encountering of a known danger . . . is reasonably to be interpreted as evidence of such consent.'" Reimer v. City of Crookston, 326 F.3d 957, 967, 969 (8th Cir. 2003) (quoting Iepson v. Noren, 308 N.W.2d 812, 815 (Minn. 1981)). In addition, the Eighth Circuit has warned that a generalized view of the relationship and risk, such as that advanced by CNH, should be rejected "in favor of a 'more detailed' inquiry into the 'particular risk' causing the injury." Id. at 968-69 (rejecting the generalized characterization of the risk of being burned by scalding water while working on a boiler in favor of the more specific characterization of the risk of being burned by scalding water while performing a noninvasive ultrasound test on a boiler) (quoting Griffiths v. Lovelette Transfer

---

[4] CNH does not even address the issue of manifestation of consent, instead proceeding directly to the three elements of assumption of the risk.

Co., 313 N.W.2d 602, 605 (Minn. 1981)). But even if the evidence established, as a matter of law, a manifestation of consent by Keller, the undisputed evidence fails to conclusively establish the three necessary elements of primary assumption of the risk.

"Whether a party has primarily assumed the risk is usually a question for the jury," and, thus, "[when] primary assumption of the risk is at issue, only those cases with overwhelming and conclusive records lend themselves to summary judgment resolution." Id. at 967, 970 (quotation omitted). As the Minnesota Court of Appeals has commented, there are a "limited number of cases in which the doctrine of primary assumption of risk applies" and "an even more limited number of cases in which the evidence is so clear and undisputed as to present no fact issues for the jury." Goodwin v. Legionville Sch. Safety Patrol Training Ctr., Inc., 422 N.W.2d 46, 50 (Minn. Ct. App. 1988). Finally, the application of primary assumption of the risk "requires actual knowledge of a known risk." Reimer, 326 F.3d at 966. The fact that "'it merely appears that [the plaintiff] should or could have discovered the danger'" is not sufficient. Id. (alteration in original) (quoting Coenen v. Buckman Bldg. Corp., 153 N.W.2d 329, 338 (Minn. 1967)).

CNH emphasizes that (1) "the last thing Keller did before leaving the [operator's seat] was push the [AHHCS] down button, which would have engaged the [AHHCS] telling the Header to go to the down position" and (2) Keller crawled under the Header without setting the safety lock. Def.'s Mem. in Supp. of Mot. for Summ. J. [Docket No. 55] at 17. Under these circumstances, CNH contends, an experienced operator like Keller would "'fully know and understand and appreciate the risk of injury or death if [he] crawled under the [Header] without the safety lock engaged'" and without disengaging the AHHCS and turning off the Combine. Id. at 17-19 (quoting Haws Aff., Jan. 30, 2009, Ex. 10 (Kock Dep.) 34:21-25). Keller could have

6

avoided the risk, CNH maintains, by taking such precautionary measures, but he voluntarily chose to accept the risk. Plaintiff advocates a more specific characterization of the particular risk that led to Keller's death: the risk that when the Header rose to the full up position despite not being directed to do so by Keller, the AHHCS would remain engaged and continue to direct the Header to come down "unexpectedly" while Keller was not in the operator's seat. Pl.'s Mem. in Opp'n to Mot. for Summ. J. [Docket No. 60] at 21. This particular risk, Plaintiff concludes, was not apparent to Keller and therefore was not assumed by him when he crawled underneath the Header.

Issues of fact persist on the extent of Keller's knowledge and appreciation of the particular risk that ultimately led to his death. Plaintiff's expert, Stewart Fluent, testified at deposition that "over the course of the many years [Keller] operated [the Header], he never saw the header in the full up position without [the AHHCS] being off, so that whenever he looked at the header in the full up position, it would indicate to him that it was off." Haws Aff., Jan. 30, 2009, Ex. 11 (Fluent Dep.) 89:4-90:9. Fluent explained that there was nothing about Keller's past experiences or the circumstances of September 30, 2005, that would have indicated to Keller that a mechanical malfunction was causing the Header to go to the full up position and remain there "without it being manually put there" and that the AHHCS was still engaged and attempting to direct the Header to the full down position. Id. 91:2-92:23. In other words, the Header rose to the full up position in only two instances: (1) when it had been directed to that position in the manual mode and (2) when the operator engaged the AHHCS and set the height to the full up position. Given that the setting on the AHHCS on September 30, 2005, was the full down position and yet the Header rose to the full up position, Keller would have assumed that

7

the AHHCS was not engaged because if it had been, it would have directed the Header down. Only after the accident was it discovered that the AHHCS was operating properly but being obstructed by a bent pipe, which was a risk that was unknown to Keller. The credibility or believability of Plaintiff's theory of the case and Fluent's testimony that the circumstances would not have informed Keller that the AHHCS was still engaged and had never stopped directing the Header to come to the full down position are matters for jury consideration.

      CNH criticizes as pure speculation Plaintiff's arguments and the testimony of Fluent regarding the extent of Keller's knowledge on the day of the accident.[5] Yet CNH devotes considerable attention to analyzing witness testimony in making its own argument regarding what Keller must have known about the operation of the Combine and the Header and whether that knowledge would have appraised him of the risk he was facing on the day of the accident. Although witnesses who were familiar with the operation of the Combine and the Header or who were familiar with Keller's experience as a farmer (or both) have some basis for their testimony on the issue of what Keller must have known and appreciated on the day of the accident given his experience, none of the witnesses can definitively say what Keller knew. A factfinder assessing the weight and credibility of the testimony presented by the witnesses is better positioned to make this determination, particularly given that resolution of primary assumption

---

[5] CNH argues in its reply brief that "Plaintiff has no admissible evidence that . . . Keller did not primarily assume the risk of injury." Def.'s Reply Mem. in Supp. of Mot. for Summ. J. [Docket No. 66] at 2. However, the burden is on CNH to prove primary assumption of the risk; it is not on Plaintiff to disprove the defense. See T.H.S., 66 F.3d at 176 ("[Defendant] fell far short of proving . . . primary assumption of risk by [plaintiff]."); Walk, 180 F.3d at 942 (Lay, J., dissenting) ("[T]o establish assumption of the risk, in either the primary or secondary stage, *the defendant must show* that the plaintiff (1) had knowledge of the risk; (2) had an appreciation of the risk; and (3) had a choice to avoid the risk but voluntarily chose to chance the risk.") (emphasis added).

of the risk at summary judgment is rarely appropriate. See Walk, 180 F.3d at 942 (Lay, J., dissenting) ("[W]hether one is sufficiently 'experienced' to appreciate a risk is a factual issue, not a legal one; this issue is best left to the trier of fact and as such belongs exclusively to the jury.").

C.     **Defective Design Claims**

Under Minnesota law, Plaintiff's asserted claims of negligence, strict products liability, design defect, and failure to warn are analyzed under a "unified theory of strict product[s] liability." See Rosholt v. Blaw-Know Constr. Equip. Corp., Civ. No. 04-1181, 2006 WL 839505, at *2 (D. Minn. March 29, 2006) (citing Bilotta v. Kelley Co., Inc., 346 N.W.2d 616, 623 (Minn. 1984)). To survive summary judgment, Plaintiff must demonstrate that a genuine issue of material fact exists with regard to whether (1) CNH's product was in a defective condition that rendered it unreasonably dangerous to the Keller, (2) the defect existed when it left CNH's control, and (3) the defect was the proximate cause of Keller's death. See Bilotta v. Kelley Co., Inc., 346 N.W.2d 616, 623 n.3 (Minn. 1984). CNH argues that Plaintiff's claims fail on the first and third elements.

1.     **Expert Testimony on Defective Design**[6]

Proof that a product is unreasonably dangerous generally requires a showing of a feasible, alternative safer design. See Kallio v. Ford Motor Co., 407 N.W.2d 92, 96 (Minn. 1987). CNH contends that Plaintiff cannot establish that a defective design existed, arguing that

---

[6] CNH argues that the February 23, 2009 Affidavit of Stuart Fluent [Docket No. 62] contains new opinions that were not previously disclosed and, for that reason, those new opinions should be ignored. In this Order, the Court has not considered the matters in, or ruled on the admissibility of, Fluent's February 23 affidavit.

9

the expert testimony Plaintiff has offered on the issue of a feasible, alternative design does not meet the standards for expert testimony required by the Federal Rules of Evidence and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).

Under Rule 702 and <u>Daubert</u>, district courts are required to act as gate-keepers and ensure the reliability and relevancy of expert testimony. Fed. R. Evid. 702, cmts. to 2000 Amendments; <u>see</u> <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 149 (1999); <u>see also</u> Fed. R. Evid. 104(a). District courts may admit expert testimony to help the jury understand the evidence or determine a disputed fact if: (1) the witness qualifies as an expert by his or her knowledge, skill, experience, training, or education; (2) the witness bases his or her testimony on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." <u>Lauzon v. Senco Prods., Inc.</u>, 270 F.3d 681, 686 (8th Cir. 2001) (citing <u>Daubert</u>, 509 U.S. at 592 n.10).

The Supreme Court in <u>Daubert</u> outlined four non-exclusive factors courts may weigh in determining admissibility: (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review and publication; (3) the theory or technique's known error rate; and (4) whether the theory or technique is widely accepted. 509 U.S. at 593-94. These factors "are not exhaustive or limiting, and a court must use the factors as it deems fit to tailor an examination of the reliability of expert testimony to the facts of each case." <u>Presley v. Lakewood Eng'g & Mfg. Co.</u>, 553 F.3d 638, 643 (8th Cir. 2009). "[D]oubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility."

Miles v. Gen. Motors Corp., 262 F.3d 720, 724 (8th Cir. 2001). The general rule is that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion on cross-examination." Hose v. Chicagor Nw. Transp. Co., 70 F.3d 968, 974 (8th Cir. 1996). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Bonner v. ISP Techs., Inc., 259 F.3d 924, 929-30 (8 th Cir. 2001).

Plaintiff's expert, Stuart Fluent, opined that designing the Combine and the Header to automatically disengage the AHHCS when the Header reached the full up position would have been a feasible, alternative design that would have been safer. Fluent Report I at 4. In addition, Fluent opined that CNH could have used other "inexpensive design features and techniques" to improve safety including (1) designing the Combine and Header to disengage the AHHCS when the Header is shut off (2) connecting the AHHCS to an "operator presence system" ("OPS") that would disengage the AHHCS when the operator left the cab of the Combine, or (3) designing the AHHCS to automatically disengage at a designated point near the higher end of the Header's height range. Haws Aff., Jan. 30, 2009, Ex. 15 (Fluent Report II) at 5. CNH does not challenge Fluent's qualification to render engineering opinions and instead focuses its challenge on Fluent's failure to test his proposed alternative design.[7]

---

[7] In its opening brief, CNH's Daubert argument was aimed at the testimony of Daniel Kock and Stuart Fluent. Plaintiff concedes that Kock is not qualified to offer expert opinions on engineering matters such as alternative designs. Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 36. Rather, Plaintiff asserts that Kock's testimony will relate to his knowledge about the farming industry and farming equipment in general. CNH does not contest Kock's qualifications to offer testimony on these subjects. Def.'s Mem. in Supp. of Mot. for Summ. J. at 11.

A feasability test reveals whether the proposed alternative design will enhance safety without compromising utility.  See Young v. Pollock Eng'g Group, Inc., 428 F.3d 786, 790 (8th Cir. 2005).  Fluent's testimony offers an explanation of how designing the Combine and the Header to disengage the AHHCS when the Header reaches the full up position or some predetermined position near the top of the Header's range of motion or when the operator leaves the cab of the Combine would have lessened the risk and increased Keller's safety on the day of the accident.  And, as Plaintiff argues persuasively, feasibility without compromising the utility of the Combine and the Header is shown by other combines and headers having been manufactured with safety mechanisms similar to the designs proposed by Fluent.  Defendant's witness, Don Watt, testified that CNH began developing a version of an OPS in the mid to late 1980s and began incorporating that OPS on combines manufactured after January 1, 1990.  See Watt Dep. 25:11-32:21.  By the fall of 1992, CNH had begun wiring the OPS to the AHHCS, such that the AHHCS would be disengaged if the operator left the cab of the combine.  See id. 48:1-50:18, 64:20-65:6.  Despite Fluent's failure to test his proposed alternative designs, the Court finds that Fluent's opinions meet the requirements of Daubert and are admissible.  See Young, 428 F.3d at 790 (concluding that an expert did not need to conduct a detailed feasibility test of the proposed alternative design given that the design had already been incorporated and used successfully by others); see also Winters v. Fru-Con Inc., 498 F.3d 734, 742 (7th Cir. 2007) (declining to require alternative design testing as "an absolute prerequisite to the admission of expert testimony" in recognition of the fact that the Daubert inquiry is intended to be a "flexible inquiry.") (quotation omitted).

  **2.**  **Proximate Cause**

"Generally, proximate cause is a question of fact for the jury; however, where reasonable minds can arrive at only one conclusion, proximate cause is a question of law." Lubbers v. Anderson, 539 N.W.2d 398, 401 (Minn. 1995). In asserting that Plaintiff failed to demonstrate that the alleged defect in the design of the Combine and the Header was the proximate cause of Keller's death, CNH argues that Keller's own actions in failing to heed warnings, engage the safety lock, disengage the AHHCS, and turn off the combine constitute a "superseding cause" that breaks the causal connection between the alleged design defect and Keller's death, thus relieving CNH from liability. See Wartnick v. Moss & Barnett, 490 N.W.2d 108, 113 (Minn. 1992) (stating that the doctrine of superseding cause, if established, "prevents the original negligent actor from being liable for the final injury."). An intervening act is a superseding cause when four elements are satisfied: (1) its harmful effects must have occurred after the original negligence; (2) it must not have been brought about by the original negligence; (3) it must have actively worked to bring about a result which would not otherwise have followed from the original negligence; and (4) it must not have been reasonably foreseeable by the original wrongdoer. Canada ex rel. Landy v. McCarthy, 567 N.W.2d 496, 507 (Minn. 1997).

There is no dispute that Keller's conduct on the day of the accident occurred after CNH's alleged design defect. As to the second and third elements, CNH argues that Keller had been instructed to always engage the safety lock, disengage the AHHCS, and stop the engine before working under the Header. Therefore, CNH maintains, Keller's actions were not brought about by CNH's allegedly defective design and his death would not have occurred if he had used the safety lock, disengaged the AHHCS, or stopped the engine. Plaintiff responds that CNH's argument "begs the ultimate fact question" of whether the design was unreasonably dangerous

and whether the warnings and instructions were inadequate and led Keller to believe that the AHHCS would disengage or would not direct the Header to suddenly come down during a situation in which the Header had unexpectedly risen to the full up position without any prompting by Keller. Because a fact question remains regarding the fourth element, reasonable foreseeability by the wrongdoer, whether Keller's actions on the day of the accident constitute a superseding cause is not decided here.

In arguing that Keller's actions on the day of the accident were not reasonably foreseeable as a matter of law, CNH relies on Rosholt v. Blaw-Know Constr. Equip. Corp., No. 04-CV-1181, 2006 WL 839505 (D. Minn. Mar. 29, 2006). Rosholt was a foreseeable misuse case, not a case involving a superseding cause, and therefore is inapposite. See id. at *4. Plaintiff has presented evidence that tends to support an inference that Keller's actions on the day of the accident were reasonably foreseeable to CNH. For example, CNH's expert, Richard McMillen, agreed that it is common knowledge in the farm equipment industry that "no matter what warnings or instructions are furnished with combines[,] . . . there are occasions where human operators nevertheless . . . disregard[] those warnings" and get injured. Rufer Aff., Aug. 28, 2008 [Docket No. 42], Ex. A (McMillen Dep.) 15:20-16:1. McMillen testified further that he would not be surprised to learn that operators sometimes get out of the cab to inspect the header without taking the precautions included in the warnings and instructions. Id. 29:16-31:15. Also, Watt gave testimony supporting the inference that Keller's actions were foreseeable. Watt testified that CNH began developing an OPS in the late 1980s largely in response to learning that even though operators are instructed to "shut off engines, shut off headers, and [those sorts] of things, . . . instructions were not necessarily followed out in the

14

field by the [operators]." Watt Dep. 34:4-35:21. Reasonable minds may well differ on whether Keller's actions on the day of the accident were reasonably foreseeable to CNH, and, thus, the issue is appropriately reserved for the jury. See Regan v. Stromberg, 285 N.W.2d 97, 100 (Minn. 1979).

**D.     Post-Sale Duty to Warn**

In Hodder v. Goodyear Tire & Rubber Co., the Minnesota Supreme Court held that a post-sale duty to warn arises only in "special cases." 426 N.W.2d 826, 833 (Minn. 1988). In the wake of Hodder, courts considering whether a post-sale duty to warn existed have typically compared the facts of the case at hand to the facts that the Hodder court emphasized in finding a post-sale duty to warn. See, e.g., McDaniel v. Bieffe USA, Inc., 35 F. Supp. 2d 735, 740 (D. Minn. 1999); Ramstad v. Lear Siegler Diversified Holdings Corp., 836 F. Supp. 1511, 1517 (D. Minn. 1993). The facts emphasized in Hodder included: (1) the defendant's knowledge of problems with the product; (2) the hidden nature of the danger; (3) the fact that when the problem occurred, serious injury or death usually resulted; (4) the defendant remained in that line of business, continued to sell parts for the product, and continued to advertise the product; and (5) the defendant had undertaken a duty to warn of product dangers. See 426 N.W.2d at 833.

In comparing the facts of this case to those in Hodder, the Court concludes that this is not a "special case" in which a post-sale duty to warn arises. It appears that the parties' discovery efforts have identified only two prior accidents that may have involved circumstances similar to those that led to Keller's death. Rufer Aff., Feb. 27, 2009 [Docket No. 61], Exs. A, B; Haws. Aff., Jan. 30, 2009, Ex. 16 at 5-6. The existence of only a couple of possibly similar accidents

15

weighs against a determination that a post-sale duty to warn exists. See Ramstad, 836 F. Supp. at 1517 (concluding that "the special factors which warranted a continuing duty to warn in Hodder do not exist in the instant case" when, inter alia, a defendant "had notice of only a handful of other accidents"). Also, there is no evidence that CNH undertook a duty to warn. While the gravity of the harm that Keller sustained as a result of the alleged problem with the Combine and the Header is undoubtedly great, that factor is insufficient in this case to satisfy the special circumstances required to find the existence of a post-sale duty to warn.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant CNH America, LLC's Motion for Summary Judgment [Docket No. 53] is **DENIED** as to Plaintiff's claims of negligence, strict products liability, and breach of express and implied warranties but **GRANTED** on Plaintiff's claim for breach of a post-sale duty to warn;

2. Count Four of the Amended Complaint [Docket No. 47] is **DISMISSED WITH PREJUDICE**.

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: June 22, 2009.